UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) No. 19 CR 28-1 |
| v. | ) |
| | ) Judge Elaine E. Bucklo |
| DONALD E. MUDD | ) |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by its attorney, Morris Pasqual, Acting United States Attorney for the Northern District of Illinois, respectfully submits this memorandum in advance of the sentencing of defendant Donald E. Mudd. The government respectfully requests that this Court impose on defendant a sentence of 27 months' incarceration, which is at the low end of the advisory Guidelines range of 27-33 months' incarceration, along with an above-Guidelines fine of $100,000.

### I. PROCEDURAL BACKGROUND

In January 2019, defendant Mudd was charged with mail and wire fraud, in violation of 18 U.S.C. §§ 1341 and 1343. Dkt. 1. On February 23, 2024, defendant pleaded guilty to one count of mail fraud pursuant to a written plea agreement. Dkt. 124, 125. Defendant is scheduled to be sentenced on June 21, 2024. Defendant's co-schemer, Rodney Hawkins, also pleaded guilty and has been cooperating with the government since he was first approached by the FBI. Hawkins is scheduled to be sentenced on July 10, 2024.

II.   **BACKGROUND & OFFENSE CONDUCT**

Donald "De" Mudd, 66 years old, is retired and resides in Palm Beach Gardens, Florida. PSR[1] ¶ 72. However, for many years, defendant had residences both in Chicago and in Florida, and was an owner of Mudd-Lyman Sales and Service and Simply Service, LLC ("SSI") – Illinois companies who facilitated the placement of products in several national hardware store chains, and helped to market company's products. PSR ¶ 73. Defendant reported that his company employed 450 people when it was at its peak. *Id*.

Additionally, during the relevant time period, defendant also had a leadership role in golf course projects in Florida. In the early 2010s, including during at least part of the offense conduct in this case, Mudd was the President of the Medalist Golf Club, a private golf club in Florida whose membership included several former professional athletes and professional golfers.[2] Later in the 2010s, defendant was a business partner with Michael Jordan and was involved in opening Jordan's Florida

---

[1] The Presentence Investigation Report is referred to as "PSR," followed by the paragraph number. The Government's Version of the Offense and Defendant's Version of the Offense are referred to as "G.V." and "D.V.," respectively, followed by the page numbers and/or exhibit letters.

[2] Biggane, Brian, "Private clubs such as Medalist, Bear's Club are Palm Beach County Hot Spots for Golf's Elite," *The Palm Beach Post*, Jan. 13, 2013, *available at:* https://www.palmbeachpost.com/story/sports/pga/2013/01/30/private-clubs-such-as-medalist/7258915007/ (last accessed June 6, 2024).

2

golf club, The Grove XXIII Golf Club.³ PSR ¶ 74. According to the PSR, defendant was also involved with other business entities, according to various corporate records in law enforcement databases. PSR ¶ 73.

Defendant has no criminal history except for a Driving While Intoxicated conviction from 1980, when he was 21 years old. PSR ¶ 40. He reports having a "great" childhood. PSR ¶ 48. He is married and has two stepchildren; his family is supportive of him. PSR ¶ 51, 52. He was a caretaker to his late mother, who lived in an assisted living facility near him in Florida. PSR ¶ 49.

Although defendant is now retired, he continues to earn income from various investments, and has a net worth of over $38 million dollars (which does not include any of his wife's assets). PSR ¶ 76-77. He lives in a multi-million dollar residence in Florida with a boat ramp and an in-ground pool. PSR ¶ 53. Earlier this week, defendant paid approximately half of the restitution owed, as discussed further below.

A. Defendant's Scheme To Obtain Inflated Commission Payments

In the late 2000s and early 2010s, defendant's companies, Mudd-Lyman and SSI, provided marketing services to a sealant company, Victim Company, managing the company's products in a chain of large hardware stores, Big Box Store A.

---

³ According to publicly-available records on the website of the Florida Division of Corporations, defendant was listed as the President of this entity in 2018. https://search.sunbiz.org/Inquiry/CorporationSearch/GetDocument?aggregateId=domnp-n17000006185-d6815702-7b79-427a-869e-00af4c33e981&transactionId=n17000006185-13cfcd6a-5f0e-402b-8f65-0a6ced251d4e&formatType=PDF (last accessed June 6, 2024). Defendant did not provide information about his role in this golf club to the Probation Office.

Co-defendant Rodney Hawkins worked at Victim Company and held various roles, including Vice President. Hawkins had authority to approve payment of legitimate expenses incurred by Victim Company.

Victim Company and Mudd-Lyman/SSI had an arrangement where Mudd-Lyman/SSI would earn commissions on the sales of Victim Company's products at Big Box Store A. However, Mudd-Lyman/SSI only managed Victim Company's products at some of the Big Box Store A locations. Because Big Box Store A was not able to provide sales data by location, Victim Company and Mudd-Lyman/SSI agreed that Victim Company would pay commissions based on 75% of the sales in the region managed by Mudd-Lyman/SSI in order to approximate the amount of sales in stores that Mudd-Lyman/SSI actually managed.

Both defendant and Hawkins knew that commissions were not supposed to be paid on 100% of the sales. However, at some point in late 2009, defendant approached Hawkins with an idea: Hawkins would cause Victim Company to pay commissions based on 100% of the sales (not the 75% as agreed) and defendant and Hawkins would split the extra commissions. G.V. Ex. B at 2. Hawkins agreed; although defendant offered to give Hawkins 60% of the commissions, Hawkins instead proposed they would split the commissions 50/50. *Id*.

From 2009 until the scheme was uncovered in 2014, Hawkins caused Victim Company to pay commissions on 100% of the sales.

Once the commissions scheme began, defendant told Hawkins that in order to conceal their activities, Hawkins should not receive the kickbacks from defendant in

his own name. G.V. Ex. B at 2. Taking defendant's advice, Hawkins created a new entity, Tarheel Capital Services, LLC. *Id*. at 3. Hawkins's new company served no business purpose, other than to receive the fraudulently-obtained commission funds from defendant. Hawkins created false invoices from Tarheel and provided them to defendant, who caused Mudd-Lyman/SSI to make payments to Tarheel representing Hawkins's portion of the fraud proceeds. *Id*.

### B. Defendant's Scheme to Obtain Funds from False Invoices

In early 2011, defendant and Hawkins agreed to steal money from Victim Company a second way: through submission of false Mudd-Lyman/SSI invoices to Victim Company. Hawkins provided language to defendant to put on the invoices for the services purportedly provided by Mudd-Lyman/SSI to Victim Company. In reality, no such services were provided. Defendant then generated the false invoices and provided them to Hawkins, who caused Victim Company to pay the invoices. According to Hawkins, defendant dictated how much of a cut each of them would get from the false invoicing fraud proceeds, with Hawkins receiving approximately 32-42% and defendant keeping the rest. G.V. Ex. B at 4.

### C. Defendant's Concealment of the Scheme and Additional Methods of Distributing Fraud Proceeds

After 2011, both fraud scheme were occurring at the same time: false invoicing and the inflated commissions. Defendant retained about half of the fraud proceeds for himself. Defendant contained to pay Hawkins the remaining fraud proceeds through Hawkins's nominee entity. Defendant also distributed fraud proceeds to Hawkins in other ways, too:

5

- Defendant provided Hawkins with envelopes filled with cash, including two envelopes which contained $20,900 in cash combined, which Hawkins turned over to the FBI in 2014 once Hawkins was confronted about the scheme. G.V. at 4; G.V. Ex. C.

- Defendant provided Hawkins with a cashier's check made payable to a construction company, which Hawkins used to pay for a new garage to be constructed at his house. G.V. at 4.

- Defendant made purchases for Hawkins using defendant's credit card, including purchases of a computer, travel expenses for Hawkins family trips, and other construction expenses Hawkins incurred for work on Hawkins' residence. G.V. Ex. B at 5.

Additionally, to conceal the scheme, defendant generated a backdated document that purported to be a commission agreement between Victim Company and SSI, where Victim Company purportedly agreed to pay commissions on all of the Big Box Store A sales in the region managed by SSI. Ex. D. This document is false: not only was it created years after the purported date of July 2009, but Victim Company had never agreed to pay commissions on all of the sales, just 75% of the sales. The agreement contains defendant's signature. *Id.* Defendant put this agreement in an envelope along with cash from the fraud schemes and provided it to Hawkins in approximately 2014, intending that Hawkins sign it, too. Instead, when Hawkins was approached by the FBI, he immediately agreed to cooperate and provided the still-sealed envelope to the FBI. *Id.*

### D. Total Loss

The total amount of loss incurred by Victim Company as a result of the false invoicing scheme and the inflated commissions scheme is $951,775. There are no disputes between the parties as to the total loss amount.

### III. CORRECTIONS/OBJECTIONS TO THE PRESENTENCE INVESTIGATION REPORT

The government has no factual corrections to the Presentence Investigation Report.

### IV. GUIDELINES CALCULATIONS

The government agrees with the guidelines calculations set out by the Probation Office, as follows:

- A. **Base Offense Level:** The base offense level is 7 pursuant to Guideline § 2B1.1(a)(1). PSR ¶ 24.

- B. **Enhancement for Loss:** The offense level is increased 14 levels because the loss amount is approximately $951,755, which is greater than $550,000 but less than $1.5 million, pursuant to Guideline § 2B1.1(b)(1)(H). PSR ¶ 25.

- C. **Sophisticated Means:** The offense level is increased by 2 levels because the defendant intentionally engaged in or caused conduct constituting sophisticated means, pursuant to Guideline § 2B1.1(b)(10(C). PSR ¶¶ 26-27.

- D. **Acceptance of Responsibility:** Defendant pleaded guilty in a timely manner that avoided trial preparation by the parties and the Court, and has accepted responsibility. The offense level is decreased by 3 levels pursuant to Guidelines § 3E1.1(a) and (b). PSR ¶¶ 32-33.

- E. **Zero-point Offender:** Because defendant has no criminal history points, and it not otherwise disqualified by the provisions of Guideline § 4C1.1(a), the offense level is decreased by 2 levels. PSR ¶ 34.

Therefore, the total offense level is 18 which, when combined with the criminal history category of I, yields an advisory sentencing guidelines range of 27 to 33 months' incarceration, and an advisory fine range of $6,000 to $60,000. PSR ¶ 81, 89.

### V. A SENTENCE OF TWENTY-SEVEN MONTHS' INCARCERATION IS APPROPRIATE.

Sentencing has four purposes: retribution; deterrence; incapacitation; and rehabilitation. *See United States v. Milbourn*, 600 F.3d 808, 812 (7th Cir. 2010).

7

Before imposing a sentence, the Court must calculate the applicable advisory Guidelines range and consider the factors set forth in 18 U.S.C. § 3553(a). *See Gall v. United States*, 552 U.S. 38, 46 (2007). If a term of supervised release is imposed, the Court must consider defendant's offense conduct and the factors set forth in 18 U.S.C. §§ 3583(c) and 3553(a) in fashioning specific supervised release conditions. *See United States v. Thompson*, 777 F.3d 368, 377 (7th Cir. 2015).

The Court must consider the factors listed in § 3553(a). *United States v. Omole*, 523 F.3d 691, 697 (7th Cir. 2008). These factors include the need "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct;" and "(C) to protect the public from further crimes of the defendant." 18 U.S.C. § 3553(a)(2)(A)-(C).

In this case a sentence at the low end of the advisory Guidelines range, 27 months' incarceration, and an above-Guidelines fine of $100,000, is sufficient but not greater than necessary to satisfy the goals of Section 3553(a).

### A.     History and Characteristics of the Defendant

Defendant has an unusual background for a federal criminal defendant – unlike many defendants, he has had many advantages in life: a loving family, a history of operating successful businesses, a number of professional business connections, and wealth that affords him a very comfortable lifestyle. His crime was not borne out of need as he had a net worth of millions. Instead, he worked with Hawkins to steal from Victim Company for years, in escalating manners, because he

8

wanted to make some extra money for himself and Hawkins and believed they would not be caught.

In the Defendant's Version of the Offense, defendant explains that he engaged in the fraudulent scheme to help Hawkins with some financial strain that Hawkins was facing, and continued the scheme as Hawkins made "additional requests" of defendant over the next several years. D.V. at 2. If defendant's motivations were purely to help his colleague, defendant could have simply given funds to Hawkins. Defendant has significant assets and, in 2014 alone, the last year of the scheme, defendant had a gross income of over $1 million. PSR ¶ 73. But he didn't give finds to Hawkins out of his own pocket. He instead raided Victim Company's wallet. Defendant's explanation of a desire to assist Hawkins also does not explain why he kept approximately half of the stolen funds for himself – a gain of approximately $400,000 to defendant personally. Defendant profited from this scheme every year.

Defendant pleaded guilty, and has accepted responsibility. Earlier this week, defendant made his first restitution payments, which totaled over $450,000. Defendant's efforts to repay a significant portion of the restitution should be considered in mitigation. Defendant also has a number of health conditions, all of which can be managed by the Bureau of Prisons, but which should also be considered in mitigation. PSR ¶¶ 60-61.

### B. Seriousness and Nature and Circumstances of the Offense

Defendant's offense is serious for a number of reasons. First, it caused significant financial harm to Victim Company – almost $1 million dollars. But the

9

harms were not just the economic losses to Victim Company. Embezzlement schemes involving a high-level employee damage the corporate culture of a business, as coworkers realize that an employee that they regularly dealt with had abused their trust. Victim Company also had to use its resources to determine how much money was stolen by defendant and Hawkins, and what methods were used to accomplish the theft.

Additionally, defendant told the Probation Office that Mudd-Lyman lost customers once they became aware of the offense conduct, which was as one of the reasons his company ceased operations. PSR ¶ 73. Defendant estimated that the closure of that business put approximately fifty employees out of work. *Id*. Defendant's offense conduct negatively impacted those employees, who were uninvolved in the fraud scheme but nevertheless suffered an economic and psychologic toll when they lost their employment.

Finally, defendant's offense was serious because it lasted for several years and escalated over time, as defendant and Hawkins thought of different ways to steal money from Victim Company and hide their transactions.

### C. The Need for General and Specific Deterrence and to Protect the Public

The need for general deterrence is particularly strong for economic crimes, which are often premeditated, lucrative, and difficult for law enforcement to detect. *See United States v. Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase

10

the expected benefits of a crime and hence the punishment required to deter it.") "Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." *United States v. Brown*, 880 F.3d 399, 405 (7th Cir. 2019) (quotation omitted).

A custodial sentence is necessary to meet the goal of general deterrence. A strong message must be sent to the other businesspeople that they should not use false invoices and other devices to steal funds from companies where they are employed or for whom they are a vendor.

Specific deterrence also requires a custodial sentence. Defendant's crime was not a one-time offense. From 2009 until he was caught in 2014, multiple times each year, defendant obtained stolen funds from Victim Company – at times after putting forth the effort to create a false invoice and sending it to Hawkins. Once defendant received the stolen funds, he kept a significant chunk for himself, for his own benefit. Defendant then took steps to deliver the rest to Hawkins various ways. None of defendant's criminality was impulsive. Moreover, in between each of these criminal acts, defendant had ample time in which to consider and re-consider the illegality of the individual acts and his course of conduct. At any time he could have decided to abide by the law. Yet, he did not, but instead continued on stealing from Victim Company until he was caught. Defendant stole from Victim Company thinking no one would catch it, and was an opportunity for him and Hawkins to make some extra money.

A sentence of 27 months' incarceration properly accounts for defendant's background, the seriousness of the offense, and both specific and general deterrence.

## VI. RESTITUTION AND FINE

### A. Restitution

Restitution is owed in the amount of $951,755, and should be ordered in that amount pursuant to 18 U.S.C. § 3663A. Restitution should be joint and several with co-defendant Rodney Hawkins. Earlier this week, defendant made a pre-judgment payment of restitution in the amount of $465,427.50, which is slightly over half of the total restitution owed.

### B. Fine

The advisory Guidelines fine range is $6,000 to $60,000. PSR ¶ 89; U.S.S.G. §§ 5E1.2(c)(3), (h)(1). The maximum fine is twice the gross gain or loss from the offense, which is approximately $1.8 million dollars. It is the government's position that defendant should pay an above-Guidelines fine of at least $100,000.

The Guidelines state that "the court shall impose a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine." U.S.S.G. § 5E1.2(a). "The amount of the fine should always be sufficient to ensure that the fine, taken together with other sanctions imposed, is punitive." U.S.S.G. § 5E1.2(d).

Defendant has a significant net worth, including a $16 million residence with over $10 million in equity, and over $25 million in securities. PSR ¶ 77. In order to be sufficiently punitive, the fine has to be a significant amount given the defendant's

12

high net worth. $100,000 is an amount that would be punitive, but is still significantly below the funds representing twice the gross gain or loss from the offense ($1.8 million). Application Note 4 to Guideline §5E1.2 states that when "two times either the amount of gain to the defendant or the amount of loss caused by the offense exceeds the maximum of the fine guideline, an upward departure from the fine guideline may be warranted."

Defendant does owe a significant amount of restitution, and while he has made a substantial payment, there is still an unpaid balance of almost $500,000. However, a fine is still appropriate. First, defendant has millions of dollars in assets and can pay both a fine and restitution. Secondly, these payments serve different purposes. Restitution is repaying the victim and making them whole – taking the proceeds from the defendants and giving them back to Victim Company. A fine is a punitive measure which reflects the seriousness of the offense. A fine of at least $100,000 is appropriate here to serve the punitive purposes and to reflect the § 3553(a) factors.

## VII. CONCLUSION

Defendant's criminal conduct was repetitive and willful. The defendant's dishonesty was not a single lapse of judgment, but rather, involved years of deceit. He simply thought he could get away with taking almost a million dollars from Victim Company. The sentence imposed must show otherwise. Defendant's sentence must be sufficient to account for the seriousness of the offense and the need to deter others. The government respectfully requests that the Court sentence defendant to a

sentence of 27 months' incarceration followed by a term of supervised release, a fine of $100,000 and a restitution judgment of $951,775.

          Respectfully submitted,

          MORRIS PASQUAL
          Acting United States Attorney

By:   s/ *Michelle Petersen*
      MICHELLE PETERSEN
      Assistant United States Attorney
      219 South Dearborn, Room 500
      Chicago, IL 60604
      (312) 886-7655

Dated: June 10, 2024